Will the attorneys who are going to argue the case please pose to the podium, identify the party they will represent, and indicate the amount of time you want to reserve for recording purposes, not amplification. So if you want the people in the back of the courtroom to hear you, speak up please. Your Honor, John Burfell for the Defendant Appellant Jason Smith. I believe we have an order entered already for 15 minutes opening and 5 minutes rebuttal. Very well. Good afternoon, Your Honors. Mary Ann Stein on behalf of Timothy Barber. Also 15 minutes for opening and 5 for rebuttal. Very well. Assistant State's Attorney Noah Moskow on behalf of the people in this matter of Jason Smith. And I believe the State is being allotted 30 minutes and we were going to split it evenly between the two cases. All right. Good morning, Your Honors. My name is Claire Westwood Connelly. I'm an Assistant State's Attorney and I represent the people of the State of Illinois. I'm here to speak on behalf of the case involving Timothy Barber. Very well. Now, just so I'm clear, we're going to take the argument of both defendants and then the State. Then back to both defendants for their brief rebuttals. Correct? Correct. All right. Who wants to start? May it please the Court, my name is John Buffel. I represent Jason Smith, the younger of the two defendants. Mr. Smith was convicted at trial on two theories. First, that either defendant could be accountable for the other defendant's actions and that it was unreasonable for either defendant to bring a knife to a fistfight. The State is advancing a third theory on appeal that the evidence was sufficient to prove that Jason was, in fact, the principal and not the accomplice. In other words, that it was Jason and not the father who caused the decedent, who struck the fiddler that caused the decedent's death. This Court should reject all three theories on appeal. First, the evidence is insufficient to establish that Jason was the principal in this particular case. The Court did not make that finding at the conclusion of the trial. It specifically and expressly refused to make that finding. It said, I know the father has a knife. I don't know if there were two cutting instruments in this particular case, but I don't need to make that finding because I'm relying on this accountability theory. Secondly, after that, at sentencing, the Court went on further to say, I believe the father was more culpable than the son because, but for the father's actions, the decedent may not have died. Those statements clearly established doubt in the Court's mind with respect to whether Jason was the principal, and it certainly never made a finding that Jason was the principal. So if this Court affirms on that grounds, it would be striking out and making a finding of fact on its own. But the evidence itself establishes that Jason was not the principal in this particular case. The father was seen to have a knife before, during, and after the fight. He was seen using the knife during the fight. He, immediately after the fight was over, ran away and disposed of the knife. Jason, who was trying to avoid this fight at all times, was never seen with a knife, not before, during, or afterwards. After the fight was over, he seemed taken aback by what had occurred. He attempted to render aid and then remained on the scene, albeit in the house, once the police arrived. Now, the state points to a number of circumstances which it believes establishes Jason's guilt as a principal. But these circumstances aren't very convincing. In fact, they're extremely frenzy when you look into the facts behind them. The most important fact that the state and the co-defendant use in their joint case against my client is this very equivocal agreement of Gregory Benson, the decedent's best friend, with Timothy's attorney's suggestion that the father's knife was three inches long and fully opened. That half the knife, it was a foot-type knife, half the knife was one and a half inches, and the knife fully opened was three inches long. Now, my thumb is three inches long. Foot closed, we're talking about a knife that's half the size of my thumb. That's just not credible. And I think Greg Benson's very equivocating agreement with trial attorneys, the co-defendant attorney's suggestion that it was almost three inches long, establishes that he wasn't very positive about the length of the knife either. And that number was not... type of wounds, slashing cuts caused by something similar to a box cutter and the puncture wound six inches into his chest, into his heart. Clearly, the pathologist testified that the manner of death was different than the superficial wounds to the victim's arm and the face. So if I'm indicating correctly, I think, that one could infer that two separate weapons were used to inflict those separate types of injuries. No? I don't agree with that particular characterization of the pathologist's report. He was described, somebody described a potential weapon to him, saying that a three-inch box cutter, could that have caused the puncture wound? And the pathologist said no, it had to be something with a blade that was at least four inches long, because the ribcage could be compressed and that could cause a puncture wound long enough to kill the decedent. But I don't think that that affirmatively establishes that whatever weapon that was used to puncture the decedent's chest could not have been used to also slash at his arm and at the decedent's arm and his back. I think you would agree that it would not be unreasonable to infer from that testimony and questioning that two separate and distinct types of weapons were used to inflict two separate types of injuries on this victim. Is that an unreasonable inference? I don't think that there's a basis to establish from the medical examiner's testimony that he found that two different instruments were used. I think that he said that one, the instrument described by a co-defendant's attorney could not have caused the puncture wound to the chest. He said that the puncture wound to the chest would have had to have been caused by a longer, slimmer blade that was at least four inches in length. But I don't believe that there's anything in his testimony that would suggest that a four-inch long blade could not have caused the slashing wounds on the decedent's arm or back or under the decedent's eye. Okay. Go ahead. The other piece of evidence, and so the whole state's case, at least the joint case against my client, rests on this argument that the blade was only an inch and a half long and that the full knife was only three inches long, which in and of itself is incredible in large part because of the way that the testimony came out. But then once that's gone, the remaining evidence is merely this reported statement by my client that he stuck the victim twice after he was muffed by the victim when he discussed the event with his great aunt. That statement itself is ambiguous, and neither of those statements add up to proof beyond a reasonable doubt. Is there anything in the record that would support, and I know the stick and move and I know that, but that would support that he only hit him twice? Doesn't the record say that they were rolling and fighting for two or three minutes? Is there anything in the record that would support that he only struck him twice? Well, so all of the witnesses who testified mostly testified to what Timothy was doing. And in particular, I think it was Torian Holmes who testified that he could see Timothy's hands going towards Lamont's body. Nobody testified as to how many times Jason landed any punches, if he landed any. All we have is his statement that I stuck him twice. We do know that Lamont punched him twice, stuck him twice, if you will, right before the fight occurred. But we don't know anything exactly about what Jason did. So there's no testimony either way on that subject. So you're not going to say Lamont only struck him twice? No, Your Honor. No. Because it was a fight. Correct. And it was a fight between Jason and Lamont for a while. And then when Jason wasn't doing so well, then the father jumped in. Correct, Your Honor. But, I mean, again, I understand the argument that's being made, but I'm wondering if there's anything in the record that would support him saying, I only hit him twice. No. The State did not present any evidence on that point, neither did the defense. The only evidence that we have with regards to what Jason did during the fight was the statement, I stuck him twice. But I would also emphasize that because of the unique facts of this case and the accountability issues at play here, a finding that one defendant was the principal is necessarily a finding that the other one isn't. Only one wound caused this particular decedent's death. And the evidence against the father, in our opinion, is far stronger than the evidence against the son with this particular offense. That said, this Court can decide the case entirely on self-defense. And I think the evidence is very clear. In fact, the finding is very clear from the trial court that Lamont was the initial aggressor. He was extremely drunk. Well, his VAC was .102. He was drunk and aggressive. He was aggressive during the card game. His best friend, Greg, testified that he would have fought all night if he could. He definitely got the best of Jason. Everybody agrees to that fact. And the father only jumped in at that point. And so he was also finding that the trial court made it correct. Correct, Your Honor. And at this point, again, either defendant does not require to use inerrable judgment, right? They need to make a very important decision within a very limited amount of time. And so at this point, I think it's reasonable in this particular case for someone to bring a knife to a fistfight, especially when you're dealing with a drunk, aggressive, very large man who is unrelenting. He was about 250 pounds. 230 pounds, 5'11", which I believe is about what, 180, 175? 180, 6'3", or 6'2", and 180. How much did his father weigh? I'm unsure of the father's vital statistics, Your Honor. His father weighed 150 pounds, and they were about equal, total weight. Sure. Well, the question at this particular point is could either Jason or his father have believed that Lamont was going to inflict great bodily harm or serious injury on Jason? And I think at this point, especially after Lamont gets the best of him, it's reasonable for them to believe that. What evidence was there that great bodily harm was either about to be inflicted or had been inflicted on Jason? Well, again, it's the State's burden to disprove self-defense beyond a reasonable doubt. The State certainly did not put in any evidence that Jason was injured during the fight, but it did put in the evidence either way. So if there's no evidence either way, then there's no evidence that great bodily harm was about to be inflicted. Again, it's the State's burden to disprove that they didn't act with the belief that great bodily harm was about to occur. So if there is no evidence that great bodily harm is about to be inflicted, why is it that from the evidence you cannot draw a reasonable inference that great bodily harm was not being inflicted? It was two men, perhaps three, tussling is the word used, all around the backyard of this apartment building. Nobody said that anybody was about to be stabbed, killed, shot, hit over the head with a brick. It was a fist fight. I guess it really comes down to how many times this person had to get punched in the face before you can believe that they're in danger of great bodily harm. We know, at least, that Jason had been punched in the face twice by a very large man. I mean, 5'11", 230 pounds, that is the size of Mike Singletary when he was drafted by the Bears. We're talking about a huge man who is punching a person who, at this point, when the power jumps in, is losing the fight. I'm taller than him, substantially younger than him. I mean, you may not believe this, but I weigh 250 pounds, and I wouldn't want to get in a fight with somebody 6'3", who is 180 pounds, substantially younger than me. I mean, you know, these are good factual representations that you can make, but the evidence can also be reasonably inferred that there was no great bodily harm being inflicted, that the punches broke his jaw, broke his nose, broke skin, broke anything. I see your point, Your Honor. Nonetheless, the State certainly had the burden to disprove this factor beyond a reasonable doubt, and certainly didn't put any evidence into the record. We certainly agree with that. That said, even if the father acted with an unreasonable belief, it cannot be attributed to Jason because Jason was merely involved in the fight. So if the father jumps in with a knife and causes the decedent's death, Jason certainly can't be accountable for his father's actions. That is an individual decision that the father makes that cannot be attributed to Jason. Now, the State argues that, argued at the court below and continues to argue today, that either defendant can be accountable for the other defendant's actions. And, in fact, it even filed a motion to cite additional authority stating specifically that the State doesn't need to identify a principal to find and get a conviction on an accountability basis. I think that the State's motion and its argument, I think, certainly shows how little the State actually understands the specific issue in this case. We have no quibble with the idea that the State does not need to identify a principal for a crime that involves a specific intent to commit a criminal act. But this crime necessarily relies on a finding from the court below that the actor or the actors acted without the intent to commit a crime, that they intended or that the principal, whoever it may be, intended to commit a lawful act. In stepping back and looking at it from an objective standpoint, the court found that that was not a reasonable decision under the circumstances. But the point being is there was no intent to commit a crime. So neither defendant could have joined in to a common criminal scheme or share a specific intent to commit a crime because there's just no intent to commit a crime there. So those are the three theories that the State is advancing, and I think on all three of them it's on shaky ground, and this Court should reverse Mr. Smith's conviction for those reasons. I think in addition to that, if this Court is not willing to do so, it should get to the ineffective assistance of counsel claims. Well, before you get to the effective assistance of counsel, though, the argument that there was a robbery, that argument was made in your brief. It was also made in your court below. You're right, Your Honor. And I did just briefly overlook that. But I think that's an additional basis for self-defense. I know that the co-defendant is also going to discuss that. But certainly the robbery that occurred in this case is clear. I don't think that the State argues that there wasn't a robbery here. As soon as the decedent snatched $10 out of my client's hands, the robbery had occurred. And he punched him at the same time, so he snatched $10 with force, using physical force. Well, so the mere act of snatching him with $10 is just like the mere act of taking a curse off somebody's shoulder. That itself is a robbery. The additional force used aggravates it, at least in our opinion, but it establishes that at a minimum this was a theft from a person with use of force, which is something that the trial court was unable to understand, I think, when it made its finding that this was at best just a mere theft from a person. Well, there was also testimony that after the money was taken from your client and he was punched in the face, your client left. Or before he was punched in the face. After the money was taken from him, he left, went into the house for a period, came back out, and that's when he got in a fight with the victim. So I think Your Honor, this seems to be attenuated from this robbery. So I think, Your Honor, you're referring to the statements of Arthur Terry and potentially Katrina. Basically, Arthur Terry is the only witness to testify that the money was snatched before Jason goes in and then he comes back out and gets punched twice in the face and the fight ensues after that. But I think it's extremely important to remember what Arthur Terry's testimony under oath was, and that was very specifically that he could not remember the sequence of the events. He did say that it all happened after Jason came out. Then he also said, I can't remember the sequence of the events. Then he said that part of it happened before Jason goes in and then part of it happens after Jason comes out. I think what this court must take from that is that he really was unclear about the sequence of events. He gave an explanation for why he said this happened five years ago. I can't remember exactly what happened when. But regardless of when Jason goes inside, I think part of this – sorry, let me go back one step. The State relies on Katrina's testimony as well, stating that she never saw Jason Lamont snatch $10 from Jason right before the fight occurs. Katrina was never in a position to actually see what happened right before the fight occurs. She ran into the back stairwell before the fight started to try to tell everybody that a fight was about to happen, and then she runs into Toraine Holmes and they both fall down as he's coming out of the stairwell. So she doesn't actually see what happens before the fight occurs. She's not in a position to confirm or deny Greg Benson's testimony that the snatching of the money occurred as the punching occurred after Jason came out of the house. So there's no credible evidence really to establish that the robbery occurred before and that the money snatching occurred before Jason went in and not afterwards, after he came back out. But regardless, a crime is continuing until a person escapes to safety. The Supreme Court is very clear on that. And you can't look at just discrete acts and say, you know, a robbery occurred, and as soon as the elements are done, then that act is over. If that were the case, then, you know, we wouldn't have these felony murder cases where a robbery occurs, a person's trying to escape, somebody dies during the escape, and then the person's convicted of felony murder. And we wouldn't have the case that we cite in our brief where it's an actual robbery, the robbery occurs, a man takes food stamps at gunpoint and then says, you don't think I'm going to shoot you, do I? And then the victim says, no, I believe that you're going to shoot me. And then the perpetrator nevertheless shoots the victim and receives an extended term sentence on the grounds that the crime was committed in a brutally heinous way. What evidence are you relying on to so confidently state that it was a robbery? Didn't the victim say that it was his money? Could the trial court find or fact reasonably infer that, yes, he snatched the money from your client's hand, but he was taking back what he believed was his? Well, the victim never stated, as far as I can tell, that this was his money. The testimony was read from Greg Benson that they were paying for $3 a hand and that Jason owed the victim $3 and that the victim snatched $10 from Jason. And Greg Benson specifically testified that $7 was stolen from Jason at that time. Now, it doesn't really matter whether it was $7 that was stolen from Jason or $10 that was stolen from Jason. Importantly, something was stolen from Jason. And secondly – What do you say stolen? Taken. Taken. It was taken from him. It wasn't stolen. It was taken. But there was at least an element of the evidence that there was a dispute as to whose money it was. They were arguing over a target. So my point is the robbery angle is something that the fact finder was entitled to draw reasonable inferences from and reach a conclusion. So there was no dispute over the $7. There may have been a dispute over $3, but there was clearly no dispute over $7. There's no evidence in the record whatsoever. Am I correct, this was the third time they were arguing about it? The first two, the victim just got the money? Over the course of the night, I mean. Wasn't there testimony that there had been a couple of earlier ones where the victim said, that's my money and took it and there was no issue with it? So Jason conceded two hands where the victim alleged that Jason and his father were cheating at the game, but no one testified that. But the testimony with respect to those transactions was that that was either just trash talking or it was cordial and that the men continued to play voluntarily with each other. So it's unclear what can be drawn from that, if anything. But it is clear that the victim was not entitled to at least $7, but the court did make a finding that this was a theft from person and it was accompanied by force. I think he said at best. The court made a finding that this was at best a theft from person, but then did not consider whether it was accompanied by force or whether theft from person in this particular scenario was a felony, which it was. And a forcible felony at that. Your argument then, let's take the facts in the light most favorable to your client. Would your client have been entitled to shoot the victim at that point? The only way I would argue is yes. At that point, a defendant can use lethal force to repel a forcible felony. Once somebody commits a forcible felony, they accept the potential consequences that a person is going to use lethal force to defend themselves against that forcible felony. And whether we agree with the state of the law, that you're correctly citing the state of the law, that you are allowed to use a deadly force to prevent a robbery. And the question about whether or not the victim believed it was his money, well, that's the classic OJ case. OJ thought it was his property when he went into the hotel to commit a robbery. And this victim, whether he thought it was his money or not is irrelevant  and you have a right to defend yourself against a robbery. I believe that's your argument, correct? Correct, Your Honor. And we do cite the case, a specific case, where the court has found that you have no right to self-help in Illinois. That if you believe that somebody else has your property, you certainly have other remedies, but you can't go and just take it from them. That is a crime. That is a robbery in and of itself. So certainly, we believe that this was a forcible felony. Lethal force was justifiably used in defense and to defend against a forcible felony. I would also like to note that with respect to when this offense occurred, again, if the state could have charged it as soon as the money was snatched, Jason goes inside and comes back out, Ramon is still on the scene. He has not escaped to safety. And I think the point I was trying to make earlier is that until the perpetrator escapes to safety, the crime is ongoing. The state may charge it as soon as all the elements are met, but that does not mean that the crime is not ongoing. And we do cite the particular authority in our briefs for that case as well. Beyond that, if this court does not reverse Jason's conviction, we do think that it needs to go back for a new trial on ineffective assistance of counsel claims. The most important of that is the claim that this case really needed to be severed. My client was arguing against two different people, right? He was arguing against the prosecutor and the co-defendant. The co-defendant's attorney developed the most of the circumstantial evidence that was used against my client to establish that he may have been the principal. That was a foreseeable problem. This issue was who stabbed who was discussed before the trial began. And for that reason, a trial counsel should have separated the trials. The other ineffective assistance of counsel claims are certainly not conceding those. If the court doesn't have any questions on them, I'll yield my time. Thank you. Ms. Stein. May it please the Court. Like Smith's counsel, I'm also going to address the first issue in the briefs concerning reasonable doubt. And I'll also address issue two concerning the evidence. And I'll stand on my brief for the remaining issues. On issue one, contrary to Smith's argument, Barber was not the principal and did not cause the fatal stab wound. The State has conceded that Barber did not cause the fatal stab wound, and that conclusion is based on a sound examination of the evidence. The medical examiner testified that the fatal wound could not have been caused by a box cutter like the one Barber had that Benson described. The fatal wound was six inches deep, and Benson testified that Barber's box cutter was three inches in total and the blade was one and a half inches. The medical examiner also testified that the wound was caused by an instrument with one sharp edge and one blunt squared-off edge. A box cutter does not have a blunt squared-off edge, particularly a folding box cutter like the one pictured in Co-Defendant Smith's brief. So there had to have been another knife at the scene, and we know that Smith had a chance to grab that knife when he went inside at some point during the night. Smith also told his aunt that he stuck larkins twice, and Smith wants to argue that stuck could mean with hands, and Dorothy Brown did argue or did testify at trial that the word stuck could mean with an instrument or with hands. However, her initial reaction to that word as she testified to it at the grand jury was that it only meant with an instrument in hand. So Smith's own words said that he stuck the larkins. But she wasn't a live witness to anything. That's true, but based on what Smith has said, and also Smith specifically said that he stuck the victim twice, and the victim had two wounds that were deeper than Barber's blade. The fatal wound on the torso was six inches deep, and the wound on the left back shoulder was two inches deep. So both of those were longer than Barber's blade. Accordingly, the evidence established that Smith was the principal here who caused the fatal wound. I'd like to adopt some of Smith's arguments concerning whether or not Barber could be accountable for Smith, and Barber here was not accountable for Smith's actions. In order for a defendant to be accountable, there has to be a shared criminal intent or a common design, and neither of those were established in this case. Neither Smith as the principal, nor Barber, could have intended to commit second-degree murder. In the Lopez case, the court specifically held that it is an impossibility to intend the presence of a mitigating factor. So the defendants here could not have shared a criminal intent. There's also no common design. Barber had no advance knowledge that the fight was going to take place. He didn't know that Smith had a knife, and it's possible that Smith stabbed Larkins before Barber even jumped into the fight. The state has cited Cooper to argue that because both defendants fought against Larkins, there was a common design, but Cooper is distinguishable because both of the defendants there had knowledge of a preconceived plan. They both purposely armed themselves, they went into rival gang territory, and they both shot at the victim. So in that case, even though we don't know who the principal was, we don't know which bullet caused the fatal wound, there was a preconceived plan and intent from both defendants. In the instance case, there was no intent. Even if Barber could be accountable for Smith's actions, the stabbing was an act of self-defense, and again, I'll adopt some of Smith's arguments on that point. And I believe that there is evidence that great bodily harm was about to be inflicted here. The holding in People v. White is helpful to determining if Barber reasonably believed that lethal force was necessary. In People v. White, there was an animosity between the defendant and the victim. The victim one night came up to the defendant with a knife, and without any sort of physical contact before this, the defendant immediately took a gun and shot him. And the court found, under those facts, that the defendant established self-defense. But in the instance case here, there was a lot more physical aggression from Larkins than from the victim in White. Larkins was belligerent, he was fighting with people all night long. His friend, Benson, said that he would have continued to fight all night long. So there was an imminent danger of great bodily harm. Fight or harm? He wasn't in a physical altercation with anybody but these two defendants. Right, previously there was no physical fighting, but his friend Benson said that he would have continued to fight all night long. He had been very aggressive throughout the night, and that was Benson as his friend, that was Benson's impression. So the absence of any physical altercation with anybody else would indicate that fight meant argument in that context. Because he wasn't physically fighting, punching at other people, was he? No, but at that point in the testimony, he was talking about the fight that was going on between the defendants and Larkins. And the state has argued that there were no injuries to the defendants, and so they couldn't have used self-defense or lethal force. But in White, the court held that the defendant had a right to use lethal force against a victim even before first blood was drawn. In the Gossett case, which is cited in the state's brief, the court held that the defense of justifiable use of deadly force against an attacker would be meaningless if, as a prerequisite to using that defense, a defendant would be required to exhibit mortal wounds to himself, and that the force used is justified if necessary to prevent imminent death or great bodily harm. So there doesn't have to be injuries to either of the victims in order for them to use lethal force. What was the evidence of imminent, threat of imminent death or great bodily harm? Well, specifically at the point when Barber jumped into the fight, Larkins had been aggressive all night long. He grabbed money from Smith, punched him twice. They were rolling around on the ground. Barber, as a concerned follower, sees his son being essentially pinned on the ground by a man 50 pounds heavier than he is. And that's the point that he jumps into the fight. So certainly there are cases that... Is that evidence of a threat of death, imminent death or great bodily harm? Yes, Your Honor, I believe so. To have a man who will fight all night and is on top of you, pinning you down, I believe that, yes, that does establish great bodily harm or the risk of great bodily harm. And I would also like to adopt a defendant counsel's argument about the fact that a forcible felony was being committed here. Concerning the second issue... Was there some evidence that this had something to do with the taking of the $10 bill? Especially your client. Was there any evidence that said something to do with that? That the fight began because Smith grabbed the money? I'm sorry, because Larkins grabbed the money from Smith? Well, the State argues that there's no evidence to support defense counsel's theory that a defendant got involved because he was trying to stop or prevent the commission of a robbery upon a co-defendant. What evidence is there that the $10 bill had something to do with the stabbing of this gentleman? Well, certainly Barber's statement to the police didn't specifically say, I jumped in the fight to stop a robbery in progress, but he was present for the whole incident. He saw that Larkins was getting the best of Smith, and that's why he jumped in. Also, Benson, who was part of the card game, was standing close to Barber, so it's likely that Barber saw the money being taken as well. Even if he didn't specifically say the words, I jumped in in order to stop a forcible felony. Now, concerning the lynch issue, the trial court's exclusion of lynch evidence concerning Larkin's prior violent behavior and trial counsel's failure to admit one of those instances that was viewed admissible denied Barber the right to a fair trial. Defense counsel wanted to introduce three instances of Larkin's prior violent behavior. Two of those instances involved domestic violence against Larkin's girlfriend. In one instance, he punched his girlfriend in the jaw and threw her to the ground and threw her cell phone. And in the second instance, he broke her car window and had recently punched her. And then the third instance was a prior conviction for robbery that was ruled admissible, but trial counsel failed to admit it at trial. Now, Barber's theory of defense was that Larkins was an aggressive and violent person, one who, as his friend Benson confirmed, would have fought all night. However, the trial reflect had no prior knowledge of this because these instances weren't allowed in, and Barber was therefore denied the right to present a full defense. Now, the state has argued that there's no prejudice here because all of the parties agreed that Larkins was the initial aggressor. However, it was still useful to admit lynch evidence to show how aggressive Larkins was being through the course of the fight. In the Bedoya case, the court held that exclusion of lynch evidence was prejudicial not only because it shed light on who was the initial aggressor, but also because it illuminated whether the victim was a violent person, which was an important part of the defense. Similarly, in this case, whether Larkins was a violent person was an important part of the defense. Was there any evidence that your client knew of his violent, purportedly violent nature? No, other than what he had seen earlier in the night, and we're not arguing that it should have been admitted under the first prong of lynch where the defendant knows about the priors, just under the second prong. The cases cited by the state to support the position that lynch evidence is inadmissible when there's no question about who the initial aggressor was are distinguishable. Those cases are Jackson, Figueroa, and McGee. And in Jackson and Figueroa, the court held that the defendant was the initial aggressor, so of course lynch evidence isn't admissible there. And in McGee, there was a single shot fired, and then the incident was over. Whereas in the instant case, we have an ongoing physical fight. It wasn't just a single gunshot and then the end. And that's what was crucial to the defense to introduce lynch evidence to determine how aggressive the victim was being during the course of the fight. That's why this case is more similar to the Keith case where there was also an ongoing physical struggle. And the Keith court held that had the lynch evidence been admitted, the trial in fact may have concluded that the defendant was justified in using the amount of force that he did. So whether Barber, via Smith's staggered, was justified in using the amount of force he used was the key issue, and Barber should have been able to present that in his defense. Accordingly, the trial court's ruling on that lynch material was incorrect, and counsel's failure to introduce one of the lynch incidents denied Barber a fair trial. And he requests, if this Court does not reverse on Issue 1, that he remand for a new trial. Thank you. Good afternoon. May it please the Court. Assistant State's Attorney Noah Monskiew on behalf of the people. In the case of Jason Smith, People v. Jason Smith. Your Honor, this case is about a man, an unarmed man, who was stabbed to death in the backyard of a home during a fight. A fight between two men. The defendant, Jason Smith, and the co-defendant, his father, were not lawful and suffered four stab wounds, two of which were superficial, two of which were significantly deeper, one of which punctured his heart and was the one and only fatal wound that he suffered that night. The circuit court found both defendants guilty of second-degree murder on a theory of accountability, and the State is asking that you affirm Jason Smith's conviction today. As to the issue of beyond reasonable doubt, the issues raised under this one particular Issue 1 is a bit of a kitchen sink approach. There's a great number of arguments thrown out. The one thing that people believe would help this Court most in resolving this issue is to see, first and foremost, that there are two very distinct arguments being made by Defendant Smith in this instance. The first is a legal argument that a person under Illinois law cannot be held accountable for an offense which he cannot intend. And then the second is the more traditional factual argument of beyond reasonable doubt where the evidence is insufficient. Now, as to the legal argument, the Supreme Court cases that have been cited by the State and one of the reasons we asked to cite Cooper is to give this Court the full contours of Illinois accountability law so that this Court could see what the Supreme Court has said about it and how thoroughly and well settled this point is, in particular the fact that there are two types of accountability. The traditional one most people know is aiding and abetting. Aiding and abetting, as the Court said in Fernandez, is a specific intent offense. Well, a specific intent is needed to be shown. It's a theory of culpability, not an offense. But you need to show a specific intent to aid the ultimate offense that you're convicted of. Now, common design, which is what is at issue here, does not require a showing of specific intent. In fact, in People v. Nelson, the Supreme Court said that you can have a common design to commit a battery and be convicted of murder. And it does not matter, in fact, under Illinois law whether or not you can identify the principle. You do not need to intend the ultimate offense. You do not need to have prior knowledge of the ultimate offense. You do not need to show that there was a plan or that there was a verbal agreement. And in the cases that people have cited on this point, they're, you know, in those cases and the cases they discuss, in some cases they set out on a common criminal design to commit a robbery or a burglary. And even when the accomplices were unarmed and found a gun in one case and ended up shooting someone with the gun that they found, the other accomplices were convicted of the gun cases. So surprise is not their defense. Those cases all involved a preconceived plan. Just using Cooper-Cooper is totally distinguishable because that involved two individuals who were looking to go and harm other arrival gang members. Correct. So that was clearly a preconceived plan. It seems that your argument is that a preconceived plan is not required. That's correct. And that's what the cases that people have said. You're citing Cooper for that proposition. That's exactly the issue in Cooper. Cooper was the case that the people cited as an additional authority for the purpose of saying you don't have to prove who the principal was. That's why the people cited Cooper. If I just said Cooper, I said it by accident just now. In the motion, I thought the state was clear that it was being cited for the fact that you don't have to prove who the principal is. Now, in a common design case, what the courts have said is that you only need to show the intent to commit some criminal act and that everyone who commits that criminal act together is then culpable for the conduct of everyone else, even if what the other person does is surprising, unplanned, sudden. And Fernandez in particular says that the fact that you didn't know that this was going to happen is, quote, emphatically not part of Illinois law to say that you can't be held accountable for that. So these cases, it's the state's position, reject the defendant's argument here today that he cannot be held legally accountable for a crime that he couldn't intend. In fact, under common design, that is exactly what Illinois law says. Now, as to the factual argument, the one thing that people would really emphasize in this instance is that for the factual argument, the court of Fernandez was very explicit in saying that when you have a conviction under accountability, it is like any other conviction that you must review it in the light most favorable to the state. And this is a very fundamental thing, of course, and the court knows this. And the state isn't suggesting that the court doesn't. But the state is bringing it up because what you see in the arguments of the defendant is that the defendant is consistently arguing that this case should be reviewed in the light most favorable to the defendant. And you see this in one instance in the defendant's reply brief on page four of the defendant's reply brief. He cites a testimony from the great aunt, Dorothy, that when she came outside, she saw the defendant, Smith, tending to the wounds of the victim and helping the victim. Now, that was in direct contrast to the testimony of Gregory, who said that after the fight ended, when Lamont said, I've been stabbed, I've been stabbed, and that defendant and one other person pushed him out of the back yard and said, you have to leave. And then after that, he didn't see the defendant anymore. And Gregory said that he was the one who took his own shirt off and tended to the wounds of the victim. So those two testimonies are in complete conflict. Well, in the light most favorable to the people, that conflict has to be resolved in the state's favor. So when this court reviews this conviction, this court must, by Illinois law, review it in the light most favorable to the state. And that goes as well for the testimony on when the defendant went into the house. And the testimony from two witnesses was that the defendant went into the house after the money was taken and he was hit in the face. And this is important because before the defendant coming back out, everything was over. He was safe. There was no more threat to his safety, no more threat to his property. All he had to do was stay inside. But for his own actions, the incident was over. But he chose to come outside. And you know he chose to come outside for a reason because the other testimony shows what did he do right when he came outside. The first thing the defendant did when he came outside was he started fixing his clothes to get ready for a fight. That's what one of the witnesses testified to, that that was the first thing the defendant did. He didn't come out to say, oh, I have change for you now. I went inside to get change, was one of the testimonies. But he came out and fixed his clothes ready for a fight. And that right there shows that when the defendant Smith came out, he came out with an intent to cause bodily harm against the victim. And that alone is sufficient because when the co-defendant came in, the co-defendant came in later, but the two of them were seen and their testimony was for two to three minutes, both hitting the victim at the same time. So at that point, they clearly both had a common design to cause bodily harm to the victim. And under Nelson, that is enough for them both to be accountable for his death. Now, but the state maintains that the evidence, you know, what is right in this case is that the evidence shows that the defendant Smith really was the principal. And, you know, if you look at the actual, the way the evidence goes, and you look at one of the arguments the defendant makes is that the state put all this emphasis on the three inches that came out from the co-defendants. The state frankly doesn't understand that evidence because the emphasis on that evidence, because that's not really important to the state's case as far as the state sees it. What was important was that confession to his great aunt, I stuck him twice. And that was in the people's opening, and that was the first witness the state put on. Well, the state wouldn't have put that in the opening and wouldn't have put that witness on. I mean, Dorothy, notably, this is a death case. Dorothy was not a life-death witness, which is usually the first thing you have in a death case. But she was put on first because she testified to that confession. And again, the light was favorable to the people. That was a confession. And we can talk about slang and different use of terms, but he also... The trial court didn't make that finding correct that Jason was the principal? No, Your Honor, it did not. And, you know, that is one other thing the state would point out, though, is that sitting in review of this case, this court, of course, is always able to affirm a conviction for any reason and it's supported by the record, which means that under Illinois law, this court isn't reviewing that court's findings. This court is supposed to have deference to the findings and look at them, of course, but this court doesn't actually weigh those findings or rule on those findings. What this court rules upon is the third, the ultimate rule. The sufficiency of the evidence. Correct. So the state maintains that the evidence that the defendant said he stuck him twice, that there were two wounds that were distinctly deeper, fits the stuck him twice, and that the remarkable consciousness of guilt that the defendant showed after the fact that he moved out of the house, he wasn't there when the police came into the house, he moved out of the house, they couldn't find him for four months, and then when they did find him, he told the police, I haven't seen my father in five years, even though four months before, he was playing cards with his father and they were partners in the card game. He told the police he wasn't there that night. He told the police he'd never heard about a fight or stabbing that happened at his house. He told the police that he didn't live there, even though his aunt testified that, yeah, that's where he lived. So the state maintains that the evidence proved the defendant guilty and would ask you to affirm his conviction. As far as the ineffective assistance of counsel claims of guilt, the state maintains that the case we cited, People v. Schmidt, that there is a presumption in a bench trial that the judge is capable and did, in fact, separate out the evidence correctly, and the state maintains that under Schmidt there has been no showing, no affirmative showing that the court did not correctly separate out the evidence, and in particular where there was a partial severance granted in this case, so the court was made aware of the necessity to parse out the evidence. On that point, can you remind me whether, well, the court made a statement when the evidence was coming in, this is where the severance is taking place. I'm only considering it as to whichever one it pertained to. But was that issue raised in Schmidt's post-trial motion? Do you recall? I do not recall that particular thing. I don't either. We'll check that. All right. If there are no more questions, for these reasons than the reasons stated in the People's Brief, I would ask that you affirm defendant's misconduct. Thank you. May it please the Court, Counsel, the evidence in this case overwhelmingly established defendant Barber's guilt for second-degree murder under an accountability theory. The defendant is attacking the sufficiency of the evidence on two different bases. One is whether or not the evidence was sufficient to establish his guilt for second-degree murder, and there's another issue regarding whether or not what constitutes the accountable actions in this case under the common design. I think Court Counsel has sufficiently addressed the common design. Do you have any questions regarding that? As far as defendant Barber, I'd be happy to answer it. What I'd like to concentrate on today regarding the reasonable doubt is the sufficiency of the evidence. And the case, this case for the defendant Barber, boils down to whether the defendant's belief that the threatened force would cause death or great bodily harm was reasonable or unreasonable. The defendant was originally charged with first-degree murder. He raised an affirmative defense of self-defense, saying that there was a reasonable belief in this case where the threatened force would cause death or great bodily harm. And we have the benefit of the defendant's own words in this case. The defendant submitted a handwritten statement, and in that statement he said he explained why he got involved that day. He explained that he got involved because he was drunk and because the victim was getting the better of his son. He never said that he thought that he needed to intervene because the threatened force would cause death or great bodily harm to his son. There is no evidence that the co-defendant or the defendant had suffered any injuries in this case at any point. During the fire effort, there was no injuries. The victim never used any threatening words. He never said, I'm going to kill you. He never made any statements suggesting that the force that he wanted to use was great bodily harm or death. The defendant said in his handwritten statement that he saw the co-defendant go into the house, and somebody said that he got a knife. So the defendant entered this fight knowing, and I say defendant, I mean Defendant Barber. Defendant Barber entered this fight knowing that somebody said that the co-defendant had a knife. He admitted that he stabbed the victim two times, two or three times I should say, with a box cutter instrument. He was flipping that box cutter around while they were playing cards earlier in the evening. The defendant fled from the scene and even discarded the weapon in order to make sure that no one could trace him to that weapon. The defendant afterwards did not call an ambulance for the victim, even though the victim yelled at the end that he had been stabbed. There was nothing about the physical size of the victim, but despite what the defendant says, versus the defendant's size that would cause him to believe that threat and force was being used against the co-defendant in this case. As far as the concept of a forcible felony, self-defense and defense of others, as you know, is limited to those situations in which the threat and force will cause death or great bodily harm, or there's an alternative that there's a forcible felony. We have, again, the defendant's words in this case as to why he got involved. He said that he got involved because he was drunk and because the victim was fighting with his son. He never said that he saw the victim grab the money out of his son's hands. He may have been out there, but it doesn't mean that he necessarily saw it. He had the opportunity to explain why he got involved, and he did not say that that's why he did. There is absolutely no evidence to suggest that he got involved in this case because he believed that a forcible felony had been committed. This was merely a gambling debt dispute. This did not constitute grounds for a forcible felony. When the defendant asserted the self-defense before trial, was it limited to only the defense of himself and his son, or was it inclusive of defense of a forcible felony? I don't recall the exact moment in which defense counsels submitted the request for the alternative for the forcible felony, to be honest with you. But he did argue at trial. Yeah, he did argue at trial. I just don't know at what point he did, if he raised it prior to trial or in the opening statements. The issue was raised, and the trial court rejected it properly. So it was raised at trial. As far as the defendant's argument regarding the lynch evidence, the trial court exercised proper discretion in its determination as to the admissibility of the lynch evidence, and the trial counsel was not ineffective for failing to introduce evidence of the victim's prior conviction. We had three different arrest or convictions in this case. One was criminal damage to vehicle, an arrest. Defense counsel suggested that was a domestic violence incident. That is incorrect. That was actually an arrest for criminal damage to property, and we submit that we submitted to a case, Pueblo v. Gilbert, in which this court has found that criminal damage to property is not a crime of violence, and lynch is limited to crimes of violence. And as far as lynch evidence, we submit that lynch evidence is limited to, and look at the Illinois Rules of Evidence, I cited two in my case, in my brief, 405B2. It says, in criminal homicide or other cases, when the accused raises the theory of self-defense and there is conflicting evidence as to whether the alleged victim was the aggressor, proof may also be made of specific instances of the alleged victim's violent conduct. Lynch evidence is the admissibility of that is very narrow. Defendants wants to broaden it to explain other reasons, what to explain other reasons and other behavior for the victim in this case, but it's really very narrow. It has to do with who is the initial aggressor in the case, and there was no conflict in the evidence whatsoever as to who was the initial aggressor in this case. Clearly the victim was the initial aggressor. He was the one who was baiting the people, who punched the co-defendant two times, one or two times, depending on who you, the testimony involved. He clearly was the initial aggressor. So when you look at this, whether or not this lynch evidence made any difference whatsoever in this case, I submit that it made absolutely no difference regarding the trial court's determination in this case. In fact, the trial court did determine that the victim was the initial aggressor in this case. As far as the claim of ineffective assist of trial counsel regarding the robbery conviction, there was discussion in the record between defense counsel and the prosecutor and the trial court. The trial court was concerned to see what evidence there was in this robbery conviction that the victim had as to whether or not there was any type of violent conduct. So the judge wanted to determine whether or not what would the defense counsel be able to submit in terms of proof beyond the amount that it was just a conviction. And so when they were discussing this, the trial court said you can go ahead and introduce this, but if it's a jury trial, I'm going to want some more proof. It ended up being a bench trial. Defense counsel decided not to submit any evidence regarding this because the victim in that robbery case ended up having been deported. So it was reasonable for defense counsel in this case to not submit any testimony regarding that because the victim was not available in this case. So that was a matter of exercising reasonable judgment in this case. And again, for the claim of ineffective assist of counsel, the defendant has to show that there was some type of prejudice. And we submit that there was no prejudice in this case because the judge had already determined in its findings that the victim was the initial oppressor.  Based upon everything I've said, I respectfully request that the defendant Barber's conviction and sentence be affirmed in this case. Thank you. Thank you. Just a few points, Your Honors. With respect to facts, I think the State would like this court to use the standard of review the right most favorable to the State to ignore key pieces of evidence and only selectively introduces other pieces of evidence. For example, when it says that Arthur Terry testified that the stashing of the money occurred before Jason went into the house, well, this court is required at least to look at all of Arthur Terry's testimony. He does, in fact, testify that he can't remember the specific sequence of events, and he's very clear about that. This court can't simply ignore that testimony. It must consider all of it. Although in the right most favorable to the State, it must consider all of the testimony, and that testimony does not establish exactly when this occurred. I think the same thing occurs with respect to Greg Benson's statement with whether Jason helped the decedent after allegedly pushing him into the alleyway. The testimony is very clear on that. Greg testifies that as soon as Jason gets pushed into the alleyway, he calls the police, runs down the alleyway, and tries to wave them into the alley. He's not there. He doesn't know what happened behind him. Yes, he testifies that he doesn't see Jason helping the decedent, but he doesn't can't testify because he's not there that it didn't actually happen. So with respect to those facts, I don't think that they necessarily require this court to find that Jason was the principal. The same goes for the medical examiner's testimony. His testimony regarding a second instrument is only as good as the description of the second instrument that's given to him. Yes, he sees these wounds, and he's asked if all these wounds match this supposed three-inch foot knife that the father has. And so the medical examiner says no, they don't match that specific description of a weapon. So there must be two weapons is the thrust from that argument. But that testimony really relies on the accuracy of Greg Benson's testimony that the weapon that the father had was, in fact, when fully opened, only three inches long. And that was not positive testimony. That was simply a statement, I guess so, when it was suggested to him by the co-defendant's attorney. So for those reasons, we don't think that Jason can be found guilty as the principal, even if this court reviews the facts, the evidence and the facts most favorable to state. And I think that the best evidence for all of that is because the court couldn't make that finding. It refused to make that finding. It expressed doubts as to whether there was a second cutting instrument here. As to accountability, well, the state likes to think that you can find this court doesn't need a preconceived plan, and then it asserts that maybe there was this preconceived plan to commit a battery. Well, Jason may have walked out of the building and may have adjusted his clothes, and if Katrina is to believe, may have been adjusting his clothes in what she thought was a way of getting ready for a fight. But the court was extremely clear on this one point. Lamont Larkins was the initial aggressor and started this fight. Jason did not go out there and commit a battery. He was being beat up. He did not go out there and he was not the initial aggressor. He was being beat up. He didn't walk out there with an intent that he shared with his father to commit a battery. He walked out there and possibly prepared himself for what he thought might be an attack, which ultimately occurred. So I don't think that that necessarily establishes a preconceived plan to commit an offense. At best, it establishes that he was preparing to defend himself, which is ultimately what needed to be done, whether it was him or his father who did it. So with respect to accountability, there just isn't a preconceived criminal plan here, and that distinguishes Nelson entirely. Nelson was a preconceived criminal plan to commit a battery, and then somebody died as a result of it. Here there simply is no preconceived criminal plan to commit a battery, certainly not one that was shared with the father. The State argues that there is a need for a preconceived plan under the theory of accountability. I'm sorry, your Honor. The State argues that there is no need for a preconceived plan under the theory of accountability. The State argues that there has to be a common criminal design and that any crime that occurs following that can be attributed back to this common criminal design. But there's a key word there that's necessary, is criminal design. And the Supreme Court has been clear that there has to be an intent to commit a crime. Here there is no intent to commit a crime. The finding of the court itself establishes that there's no intent to commit a crime because these men were found guilty on an accountability theory of trying to act lawfully in self-defense. The court also made a finding that these guys were acting in self-defense against an initial aggressor who started the fight. So there is no prior plan to commit a battery here. At best, there is a necessary self-defense that occurs after Lamont Larkin commits a battery. With respect to the ineffective assistance of counsel claims, the State would like this court to think that because the co-defendant's statement was severed from the defense case, that that completely solved any of the actual hostility that occurred or that existed between their two defenses. But the reality is, even if the co-defendant's statement was separated, and it was, there's nothing that separated the evidence that was subsequently developed by the co-defendant's attorney and admitted into evidence which must have been considered by the court. The court has to consider all the evidence that comes in. And once these cases were joined for trial, once the co-defendant's attorney starts questioning Greg Benson and bringing out this inculpatory information with regards to the length of the knife, once the co-defendant's attorney starts cross-examining the medical examiner about the specific wounds and which instruments could have created those, once the co-defendant's attorney starts cross-examining Dorothy Brown about what it means or what she thought it meant to stick him, all that evidence is admitted and admitted against my client as part of this joint case against him. If they had been severed, wouldn't that evidence still have been relevant in the case against your client? It may not have been admitted at all, Your Honor. It certainly may have been relevant, but there's nothing to suggest that the State would have ever asked, for example, Greg Benson about the length of his knife. Well, that's pure speculation. But if the cases had been severed, there's nothing that I see that wouldn't have been admissible in either case because you have the same fundamental issues that the defense is raising here. Who did what and who's responsible for what? Who had one knife? Who had two knives? Were there two knives? Same information. So the evidence would have been the same. Not only one defendant would have been sitting there. We certainly don't agree that the evidence would have been the same, and I don't think it's pure speculation to say that it would have been because we know what the questions the State was going to ask. I'm sorry. Go ahead. We know what questions the State was going to ask Greg Benson because it put Greg Benson on the stand, asked all of its direct examination questions, and none of those questions involved the length of the knife. It wasn't until the co-defendant's attorney started cross-examining Greg Benson that that information came out, and our client, or the trial attorney for Jason, certainly wasn't going to bring all that information out. So it's pure speculation to believe, on the other hand, that the State would have brought that evidence in. On top of that, Your Honor, the Supreme Court's been clear, this is Daugherty, Bean, and Byron, all of which are cited in our opening brief, that an actual conflict between the defendants, actual antagonistic defenses require severance. Here, there was an actual antagonism between the two defendants, and the cases were never severed. Now, some of this evidence perhaps may have possibly been brought in by the State in separate trials, but certainly my client would not necessarily have been arguing against not only the State in opening and closing, but also the co-defendant's attorney. It would have been a more fair trial where the defense would only have to prepare to argue against Judge the State. And because the law is pretty clear on antagonistic defenses, I think this requires reversal at a minimum for a new trial, but we certainly ask for a full reversal on the sufficiency of the evidence claims. Thank you, Your Honors. Your Honors, I have just a few brief points. Concerning the first issue, I'd like to reiterate that even though Barber's statement may not have specifically used the words necessary to prevent imminent harm as the reason why he jumped in the fight, the gist of his statement was that he jumped in because Larkins was getting the best of Smith and pummeling his son, and therefore, he did believe that great bodily rights were at stake. Contrary to the State's argument, Barber did not know that Smith had a knife in advance before he jumped in. He told the police that he didn't know Smith had a knife, and he heard afterwards that he found out later Smith had a knife. Now, concerning the Lynch issue, I'm not expanding the case law on Lynch as the State has suggested. Case law already exists that holds Lynch evidence can be admitted to show how aggressive a victim was being throughout the course of the fight. Those cases that I cited in my opening argument, Bedoya and Keith, cover that. And concerning the robbery conviction that defense counsel did not bring in, it's true that counsel said his witness was deported, and that's why he wasn't going to admit it, but counsel could have simply introduced the certified report of conviction from that prior robbery. Certainly, the transcripts that we have contain the guilty plea from both Larkins in that case and the co-defendant, so he could have submitted those as well. And robbery itself, inherent in that offense, is violence. So even if you didn't have those specifics, you could have admitted that as a prior violent act. For these reasons, Barber requests that this Court reverse his conviction or land for a new trial. Thank you. Thank you. We appreciate your efforts in this regard. Everybody did a fine job in breaking their respective positions. We thank you for your efforts, and we will take them into our own devices. Thank you.